UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL GIRARD

                    Plaintiff,                          Case No. 03-71785

vs.

                                                        Honorable Nancy Edwards
                                                        Honorable Steven D. Pepe

INTERNATIONAL BUSINESS MACHINES
CORPORATION
                    and
METROPOLITAN LIFE INSURANCE COMPANY

                    Defendants.
_____/

### REPORT AND RECOMMENDATION

Plaintiff's Fourth Amended Complaint, is comprised of two counts arising under the Employment Retirement Income Act (ERISA). Count I alleges that Defendants wrongfully denied her short term disability (STD) and/or long term disability (LTD) benefits to which she was entitled. Count II alleges that Defendants interfered with her ability to access a right to which she was entitled to under ERISA.

Defendants' motions to affirm the administrative decision denying Plaintiff's claim for benefits or, alternatively, for judgment on the record (Dkt. ## 71 & 72) and Plaintiff's motion for summary disposition (Dkt. # 73) have been referred to the undersigned pursuant to 28 U.S.C. 636 (b)(1)(B).

I.    **BACKGROUND FACTS**

**A. Standard for Reviewable Facts**

Congress passed ERISA to protect participants in employee benefit plans by requiring employee plans to meet minimum standards and allowing for judicial review in federal courts. 29

U.S.C. §1001(b). Section 1132(a) allows a participant to file suit in federal court to enforce the terms of their ERISA-covered employee benefit plan. In claims without a procedural challenge to the administrator's decision, the Sixth Circuit has limited judicial review to "evidentiary materials contained in the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring) (citing *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir. 1990)). The limitation of judicial review to the administrative record is to effectuate Congress's intent in drafting ERISA which was to create a mechanism for disposition which "does not neatly fit under either Rule 52 [Bench Trial] or Rule 56 [Summary Judgment]." *Wilkins,* 150 F.3d at 619.

Therefore, because Plaintiff is challenging her entitlement to benefits under the STD and/or LTD Plans pursuant to the Plans and alleging that Defendants interfered with her ERISA rights, but not alleging that the Plans administrators failed to follow the Plans' procedures in reviewing her claim(s), the Court's review of this matter is limited to the Administrative Record.

### B. Reviewable Facts

Plaintiff was employed by Defendant International Business Machines Corporation (IBM) from July 1, 1996, until June 28, 2002 (R. 570). As a benefit of employment Plaintiff received STD and LTD insurance coverage. The STD coverage was administered by IBM under the IBM Sickness and Accident Income Plan and the LTD was administered by Defendant Metropolitan Life Insurance Company (Met Life).

During the relevant time period, 2002, STD was available to provide Plaintiff with her full salary for a maximum of 52 weeks in a period of 24 consecutive months if she were unable to work

2

because of sickness or accident (R. 192, Plan § 2.2).[1]  Pursuant to the STD Plan, all payments would cease upon termination of employment.

LTD could provide Plaintiff with 66 2/3 percent of her income if she were totally disabled and completed the waiting period (R. 196, Plan § 3.1).  The waiting period was 52 weeks of one's regularly scheduled IBM work time falling within a continuous 24 month period during which one was totally disabled and eligible to receive benefits under the STD Plan (R. 197, Plan § 3.4.1). Coverage under the LTD Plan also ended upon termination of employment (R. 204, Plan § 3.4.14). In order to receive LTD benefits an employee was required to notify Met Life no later than 12 months after the date they became entitled to receive LTD (R. 203, Plan § 3.4.10).

During an August 3, 2001, assessment at the Oakland Psychological Clinic Plaintiff explained that she had experienced a "crying breakdown" at work (R. 496).  Her father-in-law and mother-in-law, to whom she was very close, had both passed away within a week of each other, and she was unable to cope with the stress of her job.  She also indicated that "cutbacks" at work had resulted in her being placed in a new position with little training help, inappropriate supervision and negative customer feedback.  Plaintiff was diagnosed with an adjustment disorder, depression and anxiety (R. 500).

Dr. Mark Kopel, D.O., completed a Medical Treatment Report (MTR) in support of Plaintiff's request for STD on August 23, 2001 (R. 410-11).  Dr. Kopel diagnosed Plaintiff with depression and anxiety beginning on July 26, 2001, and indicated that she could return to work on September 6, 2001.

_____

[1] "Unable to work" is defined as "unable to perform the duties of the job you held at the time of your sickness or accident, or the duties of any other job that IBM determines that you are capable of performing" (R. 192, Plan § 2.2).

Dr. Linn Campbell, M.D., completed an MTR in support of Plaintiff's request for STD in September 2001 (R. 417-18).  Dr. Campbell diagnosed Plaintiff with major depressive disorder and indicated that she was to be off work for three weeks, from September 4, 2001, until September 26, 2001.  On September 20, 2001, Dr. Campbell wrote a letter indicating that Plaintiff's September 26, 2001, return to work should be at 3 days per week  for the first two weeks and then return to full time (R. 409).

The parties do not dispute that Plaintiff returned to work full time on October 10, 2001.[2]

During a October 22, 2001, medication review appointment Plaintiff reported not sleeping well and having conflicts with her boss at work (R. 516).  Her treating physician described her progress toward her treatment goals as fair and scheduled a return visit for two months.

On February 2, 2002, Plaintiff had a treatment plan review appointment at Oakland Psychological Clinic (R. 508).  Plaintiff  was described as calmer and adjusting more quickly to emotional upsets.  She was still experiencing job and financial stress and was looking for a new job (R. 508, 510).  At a February 4, 2002, medication review appointment Plaintiff is described as problematic but not depressed, with no perceptual or cognitive deficits (R. 512).

Plaintiff was notified on May 29, 2002, that her employment was to be terminated as of June 28, 2002, due to an involuntary reduction in force (R. 321).  Plaintiff failed to appear for work from May 30, 2002, until June 12, 2002.

On June 3, 2002, at 8:36 a.m. Plaintiff e-mailed her supervisor saying that she would be "off

---

[2] Plaintiff alleges that upon her return she was treated poorly and she was not given any work to do.  Yet there is no evidence to support these allegations in the Administrative Record, and Plaintiff has failed to provide any supportive evidence with her motion or responsive briefs, not even in her own affidavit.  Therefore, because there is no support for this disputed contention in the Administrative Record this Court may not consider it as part of the present review.

4

work, per my doctor's instructions" and asked that the "necessary paperwork" be forwarded (R. 522). Her supervisor responded on the same day at 2:27 p.m. saying she was not sure to what paperwork Plaintiff was referring (R. 521). Plaintiff responded via e-mail a couple of hours later saying "have contacted the doctor to see what paperwork he filled out last time. Once I know, I'll contact you. At this point, I'm considering retiring and have requested information from Benefits". On June 4, 2002, Plaintiff's supervisor reported that she had failed to appear for work since May 30, 2002, and had left a message indicating that she had a note from her physician saying she should refrain from work for one month (R. 321-22). Her supervisor was told to notify Plaintiff that she was required to submit medical documentation to IBM for this time off.

On June 4, 2002, Plaintiff had a medication review appointment at Oakland Psychological Clinic (R. 507). Plaintiff reported that she had been notified that she was being terminated from IBM and this made her angry and sad. She planned to attend school and get her B.A. degree. Her treating physician advised that she should be off work for one week and scheduled a return appointment for one month.

On June 19, 2002, a nurse from IBM contacted Plaintiff to discuss her work status and the status of the medical documentation needed to support her absence (R. 321). Plaintiff indicated that she was diagnosed with depression and anxiety, her current treatment was prescription medication and weekly therapy and she had returned to work on June 12, 2002. She was asked to have her treating physician send medical documentation to support the absence. Plaintiff explained that the doctor would be returning from vacation on June 24, 2002.

On July 1, 2002, Dr. Campbell completed a MTR in support of Plaintiff's request for STD (R. 415-16). In this report Dr. Campbell diagnosed Plaintiff with acute depression reactive to job

loss and indicated that Plaintiff was to be off work from May 28, 2002, until June 10, 2002.

The parties do not dispute that Plaintiff worked from June 12, 2002, until June 28, 2002, the last working day before her termination.[3]

On July 2, 2002, Plaintiff had a medication review session at Oakland Psychological Clinic (R. 506). At this appointment she indicated the she felt she was unfairly fired from IBM and planned to hire an attorney to pursue severance pay and pension benefits. The treating physician indicated that Plaintiff was realistic regarding her status, making satisfactory progress toward goals and was asked to return in 2 months.

During an October 22, 2002, intake examination Plaintiff reported experiencing panic attacks, anxiety, shaking, chest pain, crying, trouble sleeping, poor concentration and low esteem (R. 526). She had been attending Phoenix University, but was taking a break due to panic attacks (R. 528). She was diagnosed with generalized anxiety disorder and panic attacks and given a GAF

---

[3] Plaintiff alleges that she was told she had to return to work despite the fact that she told her supervisor she was ordered off work for one month by her doctor (Dkt. #81, p. 1). Yet there is no support for this allegation in the Administrative Record, and Plaintiff has not provided supportive evidence with her motion or responsive briefs. Plaintiff points to the aforementioned notation in the Administrative Record wherein Plaintiff's supervisor is noted to have received a message from Plaintiff that she "saw her physician, has a note indicating no work for one month" (R. 321-22). Yet, the subsequent notations indicate that Plaintiff failed to produce documentation to support a month of STD and eventually submitted the MTR from Dr. Campbell which supported STD for May 28, 2002, through June 10, 2002 (R. 320-21). These same notations also indicate that Plaintiff returned to work on June 12, 2002, and do not indicate that she ever again asked to be excused from work. No other evidence has been supplied regarding Plaintiff's return to work in June 2002.

Plaintiff also alleges that she was "actively discouraged from applying for or continuing short term disability benefits" (Dkt. # 81, p. 4). Again, beyond this bare allegation there is no evidentiary support provided for this contention in the Administrative Record nor with Plaintiff's motion and/or responsive briefs.

Because there is no evidence in the Administrative Record to support Plaintiff's disputed allegations this Court is not permitted to consider it as part of the present review.

6

of 55 [4] (R. 530).

On April 22, 2003, Plaintiff filed suit against IBM in Oakland County Circuit Court alleging various state law claims stemming from IBM's alleged refusal to allow Plaintiff to "go on short-term and long-term disability...plans in the years 2001 and 2002..." (Dkt. # 1). IBM removed the matter to this Court on May 9, 2003, and on June 18, 2003, Plaintiff amended her complaint to allege violation of ERISA for IBM's failure to pay STD and/or LTD benefits; and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq. (Dkt. # 8). Plaintiff's Second Amended Complaint was filed on January 22, 2004, and added a count alleging interference with ERISA rights in violation of 29 U.S.C. § 1140 (§ 510) (Dkt. # 38).

On January 28, 2004, Plaintiff applied for LTD through Met Life (R. 610-11). She indicated that since her termination she had worked as a Mary Kay consultant and had attended school, but had failed at both endeavors due to "lack of concentration, focus, tremors and shakes, fear of driving in stressful situation." She also indicated that her disabling injury occurred on July 12, 2001, when she broke down crying uncontrollably and the left side of her body went numb, relapses on "6/22/01" and on "7/1/2001" [sic].

On February 26, 2004, the parties stipulated to stay this matter pending Met Life's decision on Plaintiff's LTD application (Dkt. # 47).

---

[4]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

Met Life denied the claim in a letter date February 25, 2004 (R. 334). In this letter Met Life explained that Plaintiff was not entitled to LTD because her employment was terminated prior to the payment or expiration of her STD benefits, i.e. she had not been receiving STD at termination, nor had she completed the required waiting period prior to her termination.

Plaintiff appealed this decision in a letter dated April 12, 2004 (R. 342). In her appeal Plaintiff indicated that she was disabled while working for IBM, but that IBM denied her STD and that she was in the process of litigating the issue with IBM. She alleged that since she was eligible to receive STD at the time of her termination she should have received LTD at the end of the waiting period. She also insisted that Met Life review her medical records to determine if she was disabled instead of making its determination based solely on her alleged noncompliance with the LTD Plan requirements (R. 342-43). Met Life reviewed its decision but upheld the denial of the claim, and explained its decision in a letter dated August 25, 2004 (R. 570).

On September 22, 2004, IBM and Plaintiff stipulated to the entry of a third amended complaint naming Met Life as a defendant and dropping the Michigan PWDCRA claim (Dkt. # 55). Plaintiff filed the Third Amended Complaint on December 21, 2004 (Dkt. # 58). Plaintiff subsequently filed the current version of the complaint, the Fourth Amended Complaint, on March 2, 2005 (Dkt. # 66).[5]

## II.   LEGAL ANALYSIS

### A.   Standard for Judicial Review of Plan Administrator's Actions

A Court will review the Plan Administrator's decision *de novo* unless "the benefit plan gives

---

[5] This current version of the complaint alleges the same factual basis for Plaintiff's claims and the same two counts against Defendants, but removes specific ERISA allegations pertaining to violations of 29 U.S.C. § 1109, which pertains to liability for breach of fiduciary duty, and § 402 and § 402(a), which pertain to the rules for establishing a plan (see 29 U.S.C. § 1102).

the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When there is a "clear grant of discretion to the administrator," courts defer to the Administrator's decision, reviewing it only to see if it was arbitrary and capricious. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir. 1991); *Brown v. Ampco-Pittsburgh Corp.,* 876 F.2d 546, 550 (6th Cir. 1989).[6]

In the present matter, the parties agree that the Plan grants discretion to the Administrator and that the arbitrary and capricious standard is appropriate (Dkt. # 71, p. 10; # 72, p. 11; # 81, p. 7).  Indeed the Plan provides the administrator with "discretionary authority to interpret the terms of the Plan and to determine the eligibility for entitlement to Plan benefits...unless it can be shown that the interpretation or determination was arbitrary and capricious" (R. 206, Plan § 3.5.3).

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)(internal citations and quotations omitted).

Further, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor [ ] in determining whether there is an abuse of discretion.'" *Bruch*, 109 S.Ct. at 956-57 (citation omitted).

The eleventh circuit, in *Brown v. Blue Cross & Blue Shield of*

---

[6] Yet, a plan is not required to use the term "discretionary" or some other similar terminology. See *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 n. 2 (6th Cir. 1992).

> *Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990), has pointed out the difficulty of integrating factors such as self-interest into the legal standard for review where an insurance company serves as the decisionmaking fiduciary for benefits that are paid out of the insurance company's assets rather than out of the assets of the employee benefit plan. Because an insurance company pays out to beneficiaries from its own assets rather than from the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial. *Id.* at 1561-62. The court in *Brown* held that the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest. *Id.* at 1563.

*Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th 1991).


**B.      Denial of Benefits Pursuant to the Plan Provisions**

**1.      STD - IBM**

Examination of the record reveals no evidence of a claim for STD submitted to IBM by Plaintiff subsequent to her May 28, 2002, through June 10, 2002, absence.  In fact, the record reveals no applicable evidence or medical support for Plaintiff's claim that she was disabled after that time.[7] Plaintiff inexplicably points to the fact that  Dr. Campbell's last MTR was dated July 1, 2002, as support for the fact that she was still disabled on this date.  Yet this assertion ignores the fact that Dr. Campbell indicated in this MTR that Plaintiff was disabled from work only from May 28, 2002,

---

[7] Plaintiff submitted as an exhibit to her Reply Brief the first page of a multiple page award letter from the Social Security Administration (SSA), in which SSA deemed Plaintiff disabled as of June 28, 2002 (Dkt. #81, Exhibit 6).  Neither this award letter, nor any part of Plaintiff's social security application or proceedings were made part of the Administrative Record.  Further, even if Plaintiff had submitted this portion of the SSA award letter to the Plan administrator, they would not have been bound by the SSA's findings. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003); *Hurse v. Hartford Life and Accident Insurance Company*, 2003 WL 2223352 (6th Cir. 2003); *Kunstenaar v. Connecticut General Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir. 1990), *cited by, Bomis v. Metropolitan Life Ins. Co.*, 970 F. supp 584 (E.D. Mich. 1991).

10

through June 10, 2002 (R. 294-95).[8]  While it is true that this MTR was written after Plaintiff's

employment was terminated, this fact, if anything, supports Defendants' contention that Plaintiff was

not disabled as of the date of her termination.

Because it is undisputed that all Plaintiff's claims for STD benefits prior to June 10, 2002,

were paid by IBM, the record is also devoid of any evidence of any STD claim that was denied by

IBM.  It follows, therefore, that the Administrative Record lacks any final decision by the STD

Plan's administrator regarding a denial of STD benefits.[9]

IBM's decision to provide Plaintiff with STD benefits only on those dates when Plaintiff

missed work and for which she provided medical documentation for the absence was reasonable in

light of the STD Plan's provisions even after IBM's conflict of interest is considered.  The  STD

Plan states that IBM Occupational Health Services (OHS) or an employee's manager may request

a certificate of disability, an MTR or equivalent, from a treating physician whenever an employee

is absent "typically for more than three consecutive workdays" but basically for any absence

regardless of duration, and that the employee must furnish this evidence in order to be eligible for

---

[8] In fact, Plaintiff attached only the second page of the MTR to her brief, the page on which the July 1 date is reflected, and she neglected to attach the first page on which Dr. Campbell indicated Plaintiff's dates of disability (Dkt. # 81, p. 4).

[9] The Sixth Circuit, as more throughly discussed below, has read a requirement to exhaust administrative remedies into ERISA.  *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991); *see also* 29 U.S.C. §1133(2).  Courts can excuse the requirement if resort to the administrative process would be futile.  *Constantino v. TRW, Inc.*, 13 F.3d 969, 974-75 (6th Cir. 1994).
"The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir.1998).  A plaintiff must show that "it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* (quoting *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir.1996)).  Therefore, while none of the parties have mentioned Plaintiff's failure to exhaust her administrative remedies in the context of her § 502 claim against IBM, any exhaustion requirement should be deemed waived for these claims  because Plaintiff's failure to even apply for STD would surely render an appeal of the "denial" futile.

benefits for that absence (R. 193, Plan § 2.3).

After Plaintiff was notified on May 29, 2002, of the impending termination of her employment, Plaintiff failed to report for work and left a message with her supervisor saying that her doctor had ordered her off work for one month (R. 321-22, ).  Her supervisor was told by IBM OHS to notify Plaintiff that she had to provide medical documentation for this absence.  On June 19, 2002, seeing that Plaintiff had failed to provide documentation, IBM OHS contacted Plaintiff and asked for documentation for the absence – this occurred less than one month after Plaintiff's absence began and Plaintiff had already returned to work on June 12, 2002 (R. 321).  There is no indication that Plaintiff told IBM OHS that she was still disabled or needed further STD benefits during this conversation – in fact, Plaintiff does not allege that she did so.  There is also no evidence in the record that when Plaintiff returned to work on June 12, 2002, she was "unable to work" as defined by the STD Plan  –  "unable to perform the duties of the job you held at the time of your sickness or accident, or the duties of any other job that IBM determines that you are capable of performing" (R. 192, Plan § 2.2).  Further, the documentation to support the May 28, 2002, through June 10, 2002, absence came to IBM OHS from Dr. Campbell on or around July 3, 2002, with no indication that Plaintiff was disabled beyond the June 10, 2002, date (R. 320).

The STD Plan indicates that STD payments cease upon a termination of employment (R.

12

192, Plan § 2.2).[10]  Therefore it was not unreasonable nor arbitrary and capricious under the terms

of the Plan for IBM to pay STD benefits to Plaintiff only for those periods of time in which Plaintiff

was absent from work before her termination and/or submitted an MTR or equivalent to support a

claim of inability to work as defined by the Plan.

      Plaintiff's argument that she should be excused from complying with the Plan provisions due

to mental illness is not supported by the record.   IBM OHS contacted Plaintiff on June 19, 2002,

regarding obtaining medical support for her recent absence.   At that time she indicated that Dr.

Campbell would be out of the office until June 24.   Dr. Campbell then submitted the supporting

MTR on July 3, 2002.   This means that Plaintiff had the mental capabilities to speak with Dr.

Campbell at least after June 19 to arrange for her to supply the support for the May 28 through June

10 absence.  If Plaintiff still considered herself disabled she could have also asked Dr. Campbell to

support her request for further STD.  Likewise, if Dr. Campbell felt that Plaintiff were still disabled

from work she could have indicated this on the MTR.   These facts also undermine Plaintiff's

argument that IBM withheld information necessary to allow her to file an STD claim after June 10,

2002.  Plaintiff's treating physician clearly had the paperwork required to file a claim for STD, an

MTR, for the time period after June 10, 2002, given that she filed an MTR on July 3, 2002, dated

---

[10] The Plan further indicates that employees currently on STD are subject to termination of their employment due to involuntary reduction in force as if they were actively working, and that this termination would still end their STD benefits (R. 194, Plan § 2.3.2).  Therefore, even if Plaintiff had applied for and received STD for June 12 through June 28, 2002 her employment could still have been terminated by the involuntary reduction in force as planned, thereby ending her entitlement to further STD payments pursuant to the STD Plan.

    Defendants have alleged that IBM made provisions so that employees on STD at the time of the involuntary reduction in force would have their departure date extended to the earliest of: the date the employee was certified to return to work by IBM OHS, the date STD benefits expired or the date the employee's personal physician no longer cooperated with IBM OHS (Dkt. # 72, Exh. A, p. 4).  This exhibit is not part of the Administrative Record, but Plaintiff has raised no objection to its validity.  Therefore, Plaintiff may have been able to qualify for STD benefits beyond her originally scheduled departure date had she applied and been receiving STD before her termination date.

July 1, 2002, asserting that Plaintiff was disabled from work for the period from May 28 through June 10, 2002. Again, Dr. Campbell could have used this MTR to indicate that Plaintiff was disabled from work for any length of time – she chose May 28 through June 10, 2002, and it cannot be said that IBM's decision to rely on these dates in determining Plaintiff's eligibility for STD benefits was arbitrary and capricious.

For the foregoing reasons IT IS RECOMMENDED that Plaintiff's § 502 claim regarding IBM's denial of STD benefits be denied and the claim dismissed with prejudice. Likewise, Plaintiff's claim that she was denied a full and fair review of the denial of STD benefits as required by ERISA § 503 should also be denied and dismissed.

### 2.     LTD - Met Life

It is undisputed that in order to be eligible to receive LTD benefits Plaintiff would have had to have completed the "waiting period". In order to satisfy the waiting period Plaintiff needed to show that she had been totally disabled and eligible to receive STD benefits for a period of 52 weeks of her work time (occurring within a 24 month period of time) before the date LTD benefits were requested to begin (R. 197, Plan § 3.4.1).

Counting partial weeks as eligible, Plaintiff was disabled from work and eligible to receive STD benefits from July 12 through September 25, 2001 - 11 weeks; September 26 through October 10, 2001 (3 day work week) - 2 weeks; and May 28 through June 10, 2002 - 2 weeks. This is a total of 15 weeks, assuming for the sake of argument that one counts partial and shortened work weeks as STD eligible weeks.[11] For the reasons stated in the foregoing section, Plaintiff's eligibility for

---

[11] Plan § 2.3.2 suggests that IBM had the discretion to convert Plaintiff to a part-time regular employee upon determining that she could return to work (R. 194), yet the Court has no indication whether this option was exercised or Plaintiff was provided STD disability for the days missed during the shortened work weeks.

STD ended upon her termination on June 28, 2002.  Therefore, Plaintiff failed to meet the 52 week waiting period requirement.

Met Life's denial of Plaintiff's application for LTD benefits was therefore reasonable in light of the LTD Plan provisions and cannot be said to have been arbitrary and capricious.

For the reasons stated above, Plaintiff's argument that she technically met the waiting period because she has been disabled since July, 2001, and should be excused from complying with the Plan's provisions due to her mental illness and/or IBM's failure to provide her with the necessary information to apply for STD is unsupported by the record.  This is true not only because Plaintiff managed to secure Dr. Campbell's support for the May 28 through June 10, 2002, STD disability during the same time period in which she alleges to have been both mentally incapacitated and blocked by IBM employees from securing support for further STD benefits, but also because the post-termination medical records Plaintiff submitted do not contain any indication that a treating physician found Plaintiff to be totally disabled during the relevant time period.  In fact, Plaintiff apparently enrolled in college courses and started selling Mary Kay products after her termination with no apparent counter-indication from her treating physicians (R. 507, 546, 554, 610).  The fact that she blames her disability for the fact that she was not successful at these endeavors does not make her retroactively eligible for STD benefits.  The fact remains that she has failed to provide evidence that she was disabled, pursuant to the Plan definition, for the period between June 10 and June 28, 2002, and this is fatal both to her claim that she was entitled to STD disability at the time of her termination and, therefore, her claim that she technically fulfilled the waiting period.

For the foregoing reasons IT IS RECOMMENDED that the Plan  administrator's decision be affirmed and  Plaintiff's claim regarding Met Life's rejection of her LTD benefits claim be denied

and dismissed with prejudice

Likewise, Plaintiff's claim that she was denied a full and fair review of her denial as required by ERISA § 503 should also be denied, because it is undisputed that Met Life followed the LTD Plan's appeal process in reviewing the denial of Plaintiff's claim, and Plaintiff has failed to support this bare allegation with any evidence, or even substantial allegations, that the process is less than full and fair.

### C.   Interference with ERISA Rights - § 510 Violation

Plaintiff alleges "Defendants violated § 510 of ERISA" when they "intentionally interfered with Plaintiff's ability to obtain short and/or long term disability benefits" (Compl. ¶¶ 49, 51). The factual allegations that support this claim allege: (1) that "Defendant IBM did not allow Plaintiff to go on short and long-term disability...although Defendant knew Plaintiff was disabled and eligible to go on STD and LTD"; (2) that "the STD and LTD plans were administered...by MetLife"; (3) that "instead of allowing Plaintiff to go on disability, she was eventually fired"; and (4) that "Defendant IBM interfered" with Plaintiff's business relationship/expectancy relationship with MetLife "which resulted in Plaintiff not being paid STD and LTD benefits that were due and owing" (Compl. ¶¶ 9, 10, 14-16).

ERISA § 510 provides in pertinent part:

> It shall be unlawful for any person to *discharge, fine, suspend, expel, discipline, or discriminate* against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 USCS § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140 (emphasis added).

16

### 1.   Met Life

Met Life argues that it cannot be held liable to Plaintiff under § 510 both because it was not Plaintiff's employer and because it took no action to discharge, fine, suspend, expel, discipline or discriminate against Plaintiff (Dkt. # 71, pp. 16-17).[12]

Indeed, other than the bare allegation "Defendants violated § 510", Plaintiff has not alleged any facts that suggest she believes Met Life took any part in the alleged interference with her ERISA rights.  Rather she has alleged that IBM interfered with her ERISA rights, which were administered by Met Life.  There is no evidence in the record to suggest that Met Life discharged, fined, suspended, expelled, disciplined or discriminated against Plaintiff, nor had the ability to do so in its role as the administrator of the LTD Plan.  As Met Life points out, its first appearance in this matter came about 19 months after the decisions regarding Plaintiff's employment were made, when Plaintiff applied for LTD benefits.

For the foregoing reasons, IT IS RECOMMENDED that Plaintiff's § 510 claim against Defendant Met Life be dismissed for failure to state a claim upon which relief can be granted.

### 2.   IBM

#### a.   Exhaustion of Administrative Remedies

Although ERISA contains no explicit requirement that parties exhaust administrative remedies prior to filing suit, courts have relied upon "[t]he administrative scheme" of the Act to read in such a requirement.  *Miller v. Metropolitan Life Ins. Co.*, supra, 925 F.2d at 986; *see also* 29

---

[12] Met Life did not argue for an exhaustion of administrative remedies with regard to Plaintiff's § 510 claims against it despite the fact that neither her application for LTD benefits nor her appeal of the denial of same contained any allegation that Met Life rather than IBM had interfered with her ERISA rights.  Yet it is recommended that exhaustion requirement be deemed waived for this claim, as Met Life's position, as stated in the present motion, would surely render futile an attempt by Plaintiff to access Met Life's administrative remedies.

U.S.C. §1133(2) ("every employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim"). While the requirement of exhaustion is jurisdictional, courts can excuse the requirement if resort to the administrative process would be futile or if the defendant waives the requirement. *Costantino v. TRW, Inc.*, 13 F.3d 969, 974-75 (6th Cir. 1994)(allowing exception for futility); *Parson v. Union Underwear Co., Inc.*, 95 Fed.Appx. 144, 146, Slip Copy, 2004 WL 833055 at *1 (6th Cir. 2004) (allowing exception when it would be futile and parties stipulated that exhaustion had occurred).

Plaintiff does not dispute IBM's contention that ERISA § 510 claims are subject to an exhaustion requirement, nor does she argue that she exhausted IBM's administrative remedies with respect to her § 510 claims.[13] Plaintiff instead argues that exhaustion would be futile in this matter (Dkt. # 77, pp. 8-11). Essentially Plaintiff argues that because Defendants have denied her claim that she is disabled and entitled to benefits under the STD and LTD Plans, it follows that it is futile to present to IBM her allegation that her employment was terminated in order to interfere with her ability to access her STD and/or LTD benefits. Yet, as discussed above, Plaintiff was not denied STD benefits by IBM. She did not apply for STD after June 10, 2002, because, Plaintiff alleges,

---

[13] *Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499 504 (6th Cir. 2004) , involved a § 510 claim under ERISA, and notes:

Although ERISA is silent as to whether exhaustion of administrative remedies is a prerequisite to bringing a civil action, we have held that "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991). "This is the law in most circuits despite the fact that ERISA does not explicitly command exhaustion." *Ravencraft v. UNUM Life Ins. Co. of Am.,* 212 F.3d 341, 343 (6th Cir.2000). *See also Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 418 n. 4 (6th Cir.1998) (citing cases that have read an exhaustion of administrative remedies requirement into the statute).

*Coomer* did not find exhaustion futile for certain Plaintiffs even though the plan seemed to exclude the benefits sought and others claimants had been denied benefits.

IBM interfered with her ability to do so. Only Plaintiff's claim for LTD was denied by and appealed to Met Life. Therefore, the plan administrators for the STD Plan have not been given the opportunity to review Plaintiff's § 510 claim against IBM. So, the real question is whether Met Life's denial of Plaintiff's claim for LTD renders futile the STD Plan's administrative remedies with regard to Plaintiff's § 510 claim against IBM.

"The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." *Fallick, supra,* 162 F.3d at 419. A plaintiff must show that "it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* (quoting *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir.1996)).

Plaintiff's § 510 claim against IBM is based upon the allegation that she never fully recovered after her July 2001 "mental breakdown" and that she continued to come to work in 2001 and 2002 because IBM would not "allow [her] to go on short and long term disability ... although [IBM] knew [she] was disabled and eligible" for the benefits, that "IBM did not want [her] to go on these plans because IBM did not want to pay" and that "instead of allowing [her] to go on disability, she was eventually fired" (Compl. ¶¶ 9, 13-14).

In response, IBM points out that employees terminated due to the involuntary reduction in force who were receiving STD benefits at the time they were slated to be terminated did not automatically lose their STD benefits (Dkt. # 72, p. 17). In fact, as discussed above, their departure date was extended to the earliest of the date they were deemed fit to return to work, the date their STD benefits ran out or the date their treating physician no longer cooperated with IBM OHS. Therefore, IBM argues, "[Plaintiff's] termination and IBM's motivation for the termination are

19

simply irrelevant" because Plaintiff could have stayed on STD until the waiting period ended had she attempted to qualify for STD benefits prior to her termination date.  Yet this stance would not make exhaustion futile, nor serve as a complete defense to Plaintiff's § 510 claim, because Plaintiff alleges that she was coerced to remain off STD so that she would be unable to take advantage of this benefit of remaining on STD past her originally scheduled departure date.

Further, this Court is not able to consider the evidence regarding the benefits provided to employees subject to the reduction in force because that evidence is not part of the Administrative Record.  In fact, there is a dearth of information regarding the § 510 allegation in the Administrative Record, and establishing a factual record is one of the reasons exhaustion is required.  Exhaustion "enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions."  *Ravencraft v. UNUM Life Ins. Co. of Am.*, 212 F.3d 341, 343 (6th Cir.2000)(quoting *Makar v. Health Care Corp.*, 872 F.2d 80, 83 (4th Cir.1989)).  As in *Coomer*, here Plaintiff has not demonstrated "a clear and positive indication of futility" as is required.

Therefore, IT IS RECOMMENDED that Plaintiff's § 510 claim against Defendant IBM be dismissed without prejudice for failure to exhaust administrative remedies.

## II.   RECOMMENDATION

Therefore, for the reasons stated above, IT IS RECOMMENDED that the Defendant IBM's Motion (Dkt. # 72) and Defendant Met Life's Motion (Dkt. # 71) be GRANTED and Plaintiff's Complaint be DISMISSED with the following result: the LTD Plan administrator's decision to uphold the denial of Plaintiff's request for LTD benefits should be affirmed, Plaintiff's § 510 Claim against IBM should be dismissed for failure to exhaust administrative remedies and her § 510 claim against

20

Met Life should be dismissed for failure to state a claim upon which relief can be granted. Plaintiff's Motion (Dkt. # 73) should be DISMISSED.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 1, 2006                                    s/Steven D. Pepe
Ann Arbor, Michigan                                     United States Magistrate Judge


Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorney(s) of record by electronic means on March 1, 2006.

                                                        s/John F. Purdy
                                                        Deputy Clerk